**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| STEVEN M. PRYE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Case No. 2:04-cv-04248-ODS |
| v. | ) | |
| | ) | |
| ROBIN CARNAHAN, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................................1

I.     Plaintiffs Have Standing to Sue ...............................................................................1

       A.     MOPAS Has Standing .....................................................................................1

       B.     Plaintiff Scaletty Has Standing and His Claims are not Moot................................4

II.    The Constitution Does Not Give Missouri Unfettered Authority to Set
       Voter Qualification Requirements ........................................................................7

III.   The ADA and Section 504 Prohibit Voting Bans Like Missouri's ......................................9

       A.     Title II and Section 504 Apply to Voter Qualifications..........................................9

       B.     The ADA's Ban on Discriminatory Voting Standards is Consistent
              with the National Voter Registration Act ..............................................................11

       C.     Plaintiffs are Covered by the ADA and Section 504 ...........................................13

       D.     Congress Validly Authorized Plaintiffs' Claims Under the ADA
              and Section 504.................................................................................................15

              1.     Congress Validly Authorized Plaintiffs' Section 504 Claims
                     Pursuant to its Spending Power ..............................................................15

              2.     Congress Validly Authorized Plaintiffs' ADA Title II Claims
                     Pursuant to its Power under Section 5 of the Fourteenth
                     Amendment .............................................................................................17

IV.    The Equal Protection Clause Prohibits Voting Bans Like Missouri's.............................21

V.     Missouri's Voting Ban Also Violates the Due Process Clause .........................................27

VI.    Missouri Law Prohibits Voting By Individuals Under Full Guardianship ........................27

       CONCLUSION.................................................................................................................30

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alexander v. Choate*, 469 U.S. 287 (1985) ...................................................................13

*American Association of People with Disabilities v. Hood*, 310 F. Supp.2d 1226 (M.D. Fla. 2004) ........................................................................................................10

*Association for Disabled Americans, Inc. v. Florida International University*, 405 F.3d 954 (11th Cir. 2005) ..............................................................................................20

*Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002) .....................................10

*Bullock v. Carter*, 405 U.S. 134 (1972) ........................................................................8

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................................................................22, 23

*Bush v. Gore*, 531 U.S. 98 (2000) ................................................................................21

*Carrington v. Rash*, 380 U.S. 89 (1965) .........................................................................7

*City of Boerne v. Flores*, 421 U.S. 507 (1997) ......................................................19, 21

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ................................................................24

*Constantine v. Rectors and Visitors of George Mason University*, 411 F.3d 474 (4th Cir. 2005)...........................................................................................................20

*Doe v. Rowe*, 156 F. Supp.2d 35 (D. Me. 2001) ....................................................10, 19

*Dunn v. Blumstein*, 405 U.S. 330 (1972) .......................................................7, 8, 18, 21, 22, 23

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000)................................................................................................................4, 5, 6

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .....................................................................9

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966)...........................7, 21

*Hunt v. Washington State Apple Adver. Commission*, 432 U.S. 333 (1977) ...................2

*Innovative Health System v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997)............10

21269481\V-1

Case 2:04-cv-04248-ODS    Document 142    Filed 04/25/06    Page 3 of 39

*J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred International, Inc.*, 534 U.S. 124 (2001)..........................................................................................12

*Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000), *cert. denied sub nom. Arkansas Dept. of Education v. Jim C.*, 533 U.S. 949 (2001) ..................16

*Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1998)..........................10

*Kennedy Building Associate v. Viacom, Inc.*, 375 F.3d 731 (8th Cir. 2004) ..................5

*Morton v. Mancari*, 417 U.S. 535 (1974) ..........................................12

*National Organization on Disability v. Tartaglione*, 2001 WL 1231717, No. Civ. A. 01-1923, (E.D. Pa. Oct. 11, 2001)..........................................10

*Nevada Department of Hum. Resources v. Hibbs*, 538 U.S. 721 (2003).........................18

*New York v. County of Schoharie*, 82 F. Supp.2d 19 (N.D.N.Y. 2000).........................11

*New York v. United States*, 505 U.S. 144 (1992) ..........................................8

*Olmstead v. L.C.*, 527 U.S. 581 (1999)..........................................6

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003)..................2

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ..........................................7, 8, 9, 21

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001) ..........................................13

*Pennsylvania Dep't of Corrections v. Yeske*y, 524 U.S. 206 (1998)..................9, 10, 11

*Pennsylvania Protection and Advocacy, Inc. v. Houston*, 136 F. Supp. 353 (E.D. Pa. 2001) ..........................................3

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ..........................................11

*South Dakota v. Dole*, 483 U.S. 203 (1987) ..........................................8, 16

*Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83 (1998)..........................5

*Tennessee Protection and Advocacy, Inc. v. Board of Education Of Putnam County*, 24 F. Supp.2d 808 (M.D. Tn. 1998)..........................................3

*Tennessee v. Lane*, 541 U.S. 509 (200)..........................................17, 18, 19, 20

21269481\V-1

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996) ...................................................................................................1

*United States v. Georgia*, 126 S.Ct. 877 (2006) ...........................................17

*Virginia Office for Protection and Advocacy v. Reinhard*, 405 F.3d 185 (4th Cir. 2005) ...................................................................................................3

## STATE CASES

*City of St. Joseph v. Preferred Family Healthcare, Inc.*, 859 S.W.2d 723 (Mo. Ct. App. 1993) ...........................................................................................3

## FEDERAL STATUTES

42 U.S.C. § 12101(b)(4) ...........................................................................17

42 U.S.C. § 12132 ....................................................................................10

42 U.S.C. § 1973gg-6(d)(1) ......................................................................12

42 U.S.C. § 1983 ......................................................................................3

28 C.F.R. § 35.130(b)(8) ......................................................................14, 21

28 U.S.C. § 1865(b)(4) ............................................................................26

29 U.S.C. § 794(a) ..................................................................................10

42 U.S.C. § 15001, *et seq.* ......................................................................2

42 U.S.C. § 1973gg .................................................................................12

42 U.S.C. § 10801, *et seq.* ......................................................................2

## STATE STATUTES

Mo. Const. Art 8, § 2 ...............................................................................28

V.A.M.S. § 115.133 ................................................................................28

V.A.M.S. § 475.010 ................................................................................14

V.A.M.S. § 475.010(9) .........................................................................27, 29

V.A.M.S. § 494.425 ................................................................................26

V.A.M.S. § 630.167.3(4) ............................................................................................................4

## OTHER AUTHORITIES

*Michael E. Waterstone, Lane, Fundamental Rights, and Voting,* 56 Ala. L. Rev.
793, 830 (2005).............................................................................................................18

Brief Amici Curiae of Paralyzed Veterans of America, Easter Seals and Ten
Other Organizations Supporting Petitioners in *United States v. Goodman*,
2005 WL 1812484 (July 29, 2005) ......................................................................... 20

Brief of Private Respondents in *Tennessee v. Lane*, 2003 WL 22733904 (Nov. 12,
2003) .............................................................................................................................20

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

STEVEN M. PRYE, et al.,       )
                                 )
            Plaintiffs,     )
                                 )
                                 )    Case No. 2:04-CV-04248-ODS
v.                                  )
                                 )
ROBIN CARNAHAN, et. al.,   )
                                 )
            Defendants.   )

## ARGUMENT

### I.    Plaintiffs Have Standing to Sue[1]

#### A.    MOPAS Has Standing

MOPAS has standing to bring this action on behalf of its constituents who are under full guardianship and have the capacity to vote but cannot do so because of the Missouri law and constitutional provisions at issue in this case. MOPAS does not bring this action to remedy an injury to itself, as suggested by defendants. *See* Suggestions in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Br.") at 15. Instead, MOPAS brings this action on behalf of its constituents, using associational standing. In order for MOPAS to have standing to bring a suit on behalf of its constituents, MOPAS need only show that its constituents would have standing to sue on their own and that the interests it seeks to protect are germane to the organization's purpose. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 556-57 (1996) ("United Food");

---

[1] For purposes of defendants' motion for summary judgment, plaintiffs do not dispute defendants' statement of material facts. Any disputes plaintiffs have with defendants' facts are not material to either defendants' or plaintiffs' motion for summary judgment.

1

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1109-13 (9th Cir. 2003).[2]  MOPAS easily meets these two requirements.

There can be no serious dispute that the interests MOPAS seeks to protect are germane to its organizational purpose.  MOPAS has been designated as the statewide agency to protect and advocate for the legal rights of Missouri citizens who have mental illness and developmental disabilities pursuant to the Protection and Advocacy for Individuals with Mental Illness ("PAIMI") Act, 42 U.S.C. § 10801, *et seq.*, and the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15001, *et seq.*  SOUF ¶ 14.  The right MOPAS is seeking to protect in this lawsuit – the fundamental right to vote by some of its constituents – is squarely within this mission.

MOPAS also satisfies the second requirement for associational standing. MOPAS has presented evidence of specific constituents on whose behalf it sues, including plaintiff Robert Scaletty, Charles Sloan, David Casteel, Thomas Purdy, Carrie West, Tina Martin, Lena Otradovec, and "Jane Doe."  *See* Pls.' Statement of Uncontroverted

---

[2]   A third general requirement for organizational standing is that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  This requirement, however, is merely prudential and is not judicially required, and hence can be eliminated by Congress. *United Food*, 517 U.S. at 556-57.   Courts have recognized that Congress eliminated this requirement through the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, *et seq.*, and the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15001, *et seq.* under which MOPAS was created, *see* SOUF ¶ 14.  *See, e.g.*, *Oregon Advocacy Center*, 322 F.3d at 1113 ("We hold that in light of the role Congress assigned by statute to advocacy organizations like OAC, Congress abrogated the third prong of the *Hunt* test.").

21269481\V-1

Material Facts ("SOUF") at ¶ 22-90. Each of these individuals would have standing to sue on their own if MOPAS were not suing on their behalf in a representational capacity.[3]

Defendants also incorrectly contend that MOPAS is a state agency and does not have standing to bring constitutional claims under 42 U.S.C. § 1983 against the state. The case on which defendants rely for this proposition, *Virginia Office for Protection and Advocacy v. Reinhard*, 405 F.3d 185 (4th Cir. 2005) ("VOPA"), is inapposite. First, and most importantly, unlike Virginia's Protection and Advocacy organization, MOPAS is not an agency of the State of Missouri. *See City of St. Joseph v. Preferred Family Healthcare, Inc.*, 859 S.W.2d 723, 724 (Mo. Ct. App. 1993) ("MoPAS is a federally funded, independent, not-for-profit agency which is mandated under federal law to advocate on behalf of disabled individuals in Missouri."); *see also* Ex. 1 (Supp. Dec. of Shawn T. De Loyola), Attachment A (April 1991 Assurances from Governor John Ashcroft to MOPAS and U.S. Department of Health and Human Services) at ¶ 3 (MOPAS is "not administered by the State Planning Council and is independent of any

---

[3]  As discussed *infra*, Mr. Scaletty undisputedly had standing at the time this suit was filed, and his claims are not now moot. Even if this Court, however, finds that Mr. Scaletty's claims are now moot, that would not defeat MOPAS' standing to pursue this action. MOPAS alleged in its complaint that it was bringing this action "to protect and advocate for the rights and interests of Missouri citizens who have been adjudged incapacitated and who are individuals with 'mental illness' or 'developmental disabilities'," that those individuals are "MOPAS constituents," and that they "have each suffered, or will suffer, such injuries that would allow them to individually bring suit against defendants." Pls.' First Amended Complaint at ¶¶ 13, 15. Plaintiffs presented evidence about more than half a dozen affected individual constituents in their motion for summary judgment. Unlike the decisions cited by defendants where standing was challenged in a motion to dismiss, this Court must consider all evidence before the Court (and not just allegations contained in the complaint) because defendants raised their standing challenge in a motion for summary judgment. Defs.' Br. at 15-16 (citing *Pennsylvania Protection and Advocacy, Inc. v. Houston*, 136 F. Supp. 353, 366 (E.D. Pa. 2001) (granting defendants' motion to dismiss for lack of P&A standing because insufficiency of pleadings); *Tennessee Protection and Advocacy, Inc. v. Bd. of Educ. Of Putnam County*, 24 F. Supp.2d 808, 812-813 (M.D. Tn. 1998) (same)).

21269481\V-1

agency" that serves MOPAS' constituents).[4]  Second, MOPAS is asserting the rights of its constituents and not its own rights under Section 1983, as was the case in *VOPA*.  405 F.3d at 187.  Finally, Missouri has provided assurances to MOPAS that it "will not be precluded from bringing suit on behalf of [its constituents] against the State or agencies or instrumentalities of the State."  Ex. 1, Attachment A (Assurances) at ¶ 13.  The State should be precluded from arguing to this Court that MOPAS cannot sue the state, despite these assurances.  Therefore, MOPAS has standing to pursue this lawsuit on behalf of its constituents.

**B.     Plaintiff Scaletty Has Standing and His Claims are not Moot**

Defendants wrongly claim that plaintiff Scaletty does not have standing to sue because they have voluntary ceased the illegal activity that prompted the filing of Mr. Scaletty's claims.  The United States Supreme Court, however, has clearly stated that in cases such as this, it is the *defendants'* "heavy burden" to prove that it is "absolutely clear" that there is no likelihood that the wrong will be repeated – a burden that defendants have not met in this case.   *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000) (emphasis added).

> It is well settled that a defendants' voluntarily cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  If it did, the courts would be compelled to leave the defendant free to return to his old ways.  . . . A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.

---

[4] Portions of these assurances from the State of Missouri regarding MOPAS are referenced in Missouri's statutes.  *See, e.g.,* V.A.M.S. § 630.167.3(4).

*Id.* (internal citations and alterations omitted); *accord Kennedy Building Assoc. v. Viacom, Inc.*, 375 F.3d 731, 745 (8th Cir. 2004) ("heavy burden" on party asserting mootness and case moot only if "it can be said with assurance that there is *no reasonable expectation* that the violation will recur") (emphasis added).  In fact, there is a presumption of future injury when the defendant has voluntarily ceased its illegal activity in response to litigation.  *Friends of the Earth*, 528 U.S. at 191 (citing *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 109 (1998)).

Defendants cannot meet their "formidable burden" of showing that it is "absolutely clear" that Mr. Scaletty will not be wrongly prohibited from voting again.  The fact that, after the filing of this lawsuit, Mr. Scaletty was sent a voter registration card and placed on the voter rolls does not ensure that he will be able to vote in the future.[5]  Mr. Scaletty's own past experience makes this clear.  For some time after he was placed under guardianship in 1999, Mr. Scaletty also had a voter registration card and was on the voter rolls.  SOUF at ¶ ¶ 24, 29.  However, this was not sufficient to insulate him from Missouri's ban on voting by individuals under guardianship.  In October 2003, he was notified that he was being removed from the voter rolls due to his guardianship status.  *Id.* at ¶ 24.  The letter that he received from the local election authority informed him that he was ineligible to vote because Missouri law bars voting by people under guardianship.  *Id*.  Mr. Scaletty attempted to vote in the November 2004 election, but was told that he had been removed from the voter rolls and could not vote.  *Id*. at ¶ 26.  Thus, defendants' argument that Mr. Scaletty's claim is moot is without merit.

---

[5] On January 7, 2005, one month after Mr. Scaletty became a plaintiff in this case, he received a letter from the Kansas City Board of Election Commissioners, then a defendant in this case, enclosing a voter registration card.  Ex. C to Defs.' Br.

Defendants' brief confuses mootness with standing. The caselaw cited by defendants in their brief relates to standing, not mootness. *See* Defs' Br. at 13-14. While defendants correctly state that Mr. Scaletty has the burden of proving that he has standing, standing focuses on the situation at the time of the filing of the complaint – a time in which there is no dispute that defendants were wrongly prohibiting Mr. Scaletty from voting.[6] As discussed above, however, it is defendants, not Mr. Scaletty, that have the burden of proof regarding mootness. *Friends of the Earth*, 528 U.S. at 189. Defendants also incorrectly cite to standing cases to argue that Mr. Scaletty's concern that he will be prohibited from voting in the future is too speculative. The Supreme Court has made clear that these standing cases are inapposite: "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Id.* at 190; *see also id.* at 191 (citing *Olmstead v. L.C.*, 527 U.S. 581, 594 n.6 (1999)) (challenge by individual with developmental disabilities to institutionalization not mooted by defendants' post-complaint transfer to a community-based program even though pre-complaint transfer would have defeated her initial standing). Further, the interests at stake in this stage of the litigation militate against the court dismissing Mr. Scaletty's claims as moot. "By the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon a case at an advanced stage may prove more wasteful than frugal." *Id.* at 191-92. Therefore, this Court should reject defendants' argument that Mr. Scaletty does not have standing to pursue this action.

---

[6] This lawsuit was filed on October 8, 2004 by plaintiff Steven Prye, now deceased, and plaintiffs Scaletty and MOPAS joined as plaintiffs in the First Amended Complaint, filed on December 6, 2004. Mr. Scaletty did not receive a voter registration card from the Board of Elections until January 7, 2005, after the November 2004 presidential election. SOUF at ¶ 28; Defs' Br. at 10.

## II. The Constitution Does Not Give Missouri Unfettered Authority to Set Voter Qualification Requirements

To the extent that defendants suggest that states have virtually unfettered authority to set voter qualifications in state elections, their argument is unavailing.[7] Defendants rely on the opinion of a single Justice in *Oregon v. Mitchell*, 400 U.S. 112 (1970),[8] to suggest that states' power to set voter qualifications in state elections is limited only by the Civil War Amendments to the Constitution and by federal legislation authorized by Congress's power to enforce the Civil War Amendments. Even if defendants' position were correct, it begs the question because the Fourteenth Amendment is sufficiently specific to prevent states from setting discriminatory voter qualification requirements. *See, e.g., Dunn v. Blumstein*, 405 U.S. 330, 337 (1972) (durational residency requirement for Tennessee voters that deprived some individuals of the right to vote without being narrowly tailored to a compelling government interest violated the Fourteenth Amendment); *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 666-67 (1966) (poll tax violated the Fourteenth Amendment); *Carrington v. Rash*, 380 U.S. 89, 96 (1965) (bar on voting by members of the military who moved to Texas during the course of military service violated the Fourteenth Amendment). The Court in

---

[7] Defendants concede that Congress may regulate voter qualifications in federal elections, Defs.' Br. at 17, but simply argue that the ADA and Section 504 do not apply to voter qualifications. As plaintiffs explain *infra* in Section III.B., both statutes clearly apply to state voter qualifications. Defendants also concede that federal voter qualifications may violate "specific Constitutional provisions," Defs.' Br. at 17.

[8] The *Mitchell* Court was badly fractured, resulting in four opinions concurring in part and dissenting in part in addition to Justice Black's opinion announcing the judgments of the Court. Significantly, Justice Black's opinion – quoted by defendants – was joined by no other Justice and was merely "expressing his own view of the cases." *Id.* at 117. *Mitchell* provides no consistent framework for analysis of future cases that was accepted by a majority of the Court.

7

21269481\V-1

*Dunn* repeatedly cited *Mitchell*, including expressly citing it for the holding that while states have the power to impose voter qualifications, the right to vote can only be restricted if the restrictions meets strict constitutional scrutiny.  405 U.S. at 336.  *See also Bullock v. Carter*, 405 U.S. 134, 140-41 (1972) ("Although we have emphasized on numerous occasions the breadth of power enjoyed by the States in determining voter qualifications and the manner of elections this power must be exercised in a manner consistent with the Equal Protection Clause of the Fourteenth Amendment").

Moreover, Congress has acted pursuant to its authority to enforce the Fourteenth Amendment to ban state voter qualifications that discriminate based on disability – through the ADA.  *See infra* at III.A. and III.D.  Notably, a majority of the *Mitchell* Court upheld Congress's use of its Fourteenth Amendment power to ban literacy tests and other discriminatory tests and devices in both state and federal elections.  400 U.S. at 118.[9]

Congress also used its Spending power to ban state entities accepting federal funds from imposing voter qualifications that discriminate based on disability – through Section 504.  *See infra* at III.A.  Regardless of whether Congress may use an Article I power to bar states from using certain voter qualifications, it may use its Spending power to induce states not to use those qualifications.  *See South Dakota v. Dole*, 483 U.S. 203, 205-12 (1987) (even if the Constitution reserves to the states the sole power to regulate drinking ages, Congress can use its spending power to induce states to adopt a minimum drinking age).  *Cf. New York v. United States*, 505 U.S. 144, 171-73 (1992) (while Tenth Amendment bars Congress from forcing states to regulate, Congress can use its Spending

---

[9]  The *Mitchell* Court also upheld Congress's power to regulate state residency requirements and absentee ballot rules in federal elections.  400 U.S. at 118-19.

Case 2:04-cv-04248-ODS   Document 142   Filed 04/25/06   Page 14 of 39

power to induce states to regulate). *Mitchell* addressed only what Congress could require states to do, and not what Congress could induce states to do through conditioning federal spending.

### III.     The ADA and Section 504 Prohibit Voting Bans Like Missouri's

#### A.     Title II and Section 504 Apply to Voter Qualifications

Defendants' argument that Title II of the ADA and Section 504 of the Rehabilitation Act do not apply to voter qualifications is entirely without merit. Defendants wrongly contend that these laws "do not demonstrate clear congressional intent to federalize the states' voter qualification requirements for either federal or state elections," and thus do not apply in this arena. Defs.' Br. at 19-20.  The Supreme Court rejected precisely the same argument in a case involving state prisons.  In *Pennsylvania Dep't of Corrections v. Yeske*y, the state argued that the broad language of Title II of the ADA did not demonstrate a sufficiently clear intent to apply the ADA to state prisons – an area, like voting,  in which the states have substantial sovereign powers.  524 U.S. 206 (1998).  Relying on *Gregory v. Ashcroft*, 501 U.S. 452 (1991), the state argued that "absent an 'unmistakably clear' expression of intent to 'alter the usual constitutional balance between the States and the Federal Government,'" a federal statute must be interpreted to preserve a state's sovereign powers in areas of traditional and essential state functions.  524 U.S. at 209.  The Court held that, assuming that the plain statement rule of *Gregory* applies to the administration of state prisons, "the requirement of the rule is amply met [in the ADA]:  the statute's language unmistakably includes State prisons and prisoners within its coverage."  *Id.*

21269481\V-1

Title II of the ADA provides that:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The Supreme Court noted that this language "plainly covers state institutions *without any exception* that could cast the coverage of state prisons into doubt." *Yeskey*, 524 U.S. at 109 (emphasis added). Other courts addressing the scope of Title II have similarly found that its provisions apply to *all* state services, programs, and activities.[10]

Just as Title II contains no exception for state prisons, it contains no exception for state voting activities. Neither does Section 504 of the Rehabilitation Act.[11] Accordingly, courts have consistently held that these statutes apply to voting. *See, e.g., American Ass'n of People with Disabilities v. Hood*, 310 F. Supp.2d 1226, 1234 (M.D. Fla. 2004) (accessibility of optical scan voting system); *National Organization on Disability v. Tartaglione*, 2001 WL 1231717, No. Civ. A. 01-1923, *4 (E.D. Pa. Oct. 11, 2001) (accessibility of voting machines); *Doe v. Rowe*, 156 F. Supp.2d 35, 58-59 (D. Me. 2001) (state law barring voting by individuals under guardianship by reason of mental illness); *New York v. County of Schoharie*, 82 F. Supp.2d 19, 25 (N.D.N.Y. 2000)

---

[10]  *See, e.g., Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 3797 (2003) (Title II's antidiscrimination mandate "encompasses virtually everything that a public entity does"); *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998); *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997) ("Services, programs, or activities" is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context.").

[11] Section 504 applies to "any program or activity receiving Federal financial assistance," without any exceptions. 29 U.S.C. § 794(a).

Case 2:04-cv-04248-ODS   Document 142   Filed 04/25/06   Page 16 of 39

(accessibility of polling places).[12]  Indeed, Defendants' contention that the ADA mentions voting only once, and that Section 504 does not mention voting, is beside the point.  Defs.' Br. at 19-20.  In *Yeskey*, the Court dismissed the state's argument that the ADA does not mention state prisons *at all*.  The Court held that, even if that meant that Congress did not envision that the ADA would apply to state prisoners, "in the context of an unambiguous statutory text that is irrelevant.  As we have said before, the fact that a statute can be 'applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth.'"  524 U.S. at 212 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).  By the same token, the ADA's "unambiguous statutory text" makes it irrelevant how many times Congress specifically mentioned voting.  That text clearly covers all of defendants' programs, services and activities, including voting.

### B.     The ADA's Ban on Discriminatory Voting Standards is Consistent with the National Voter Registration Act

Defendants incorrectly contend that the ADA does not apply to mental capacity standards for voters because such standards are exclusively regulated by the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg.  That argument is baseless.  Defendants point to an NVRA provision permitting states to remove individuals from the voter rolls for federal elections only under limited circumstances, including "as provided by State law, by reason of criminal conviction or mental incapacity."  *Id*. § 1973gg-6(a)(3)(B).  The NVRA regulates voter registration *procedures*, and not the *substance* of

---

[12]  *See also* Michael E. Waterstone, *Lane, Fundamental Rights, and Voting*, 56 ALA. L. REV. 793, 830 (2005) ("Although voting is not specifically mentioned in the ADA as a 'service, program, or activity,' for purposes of Title II, courts have uniformly held that it is.").

21269481\V-1

state voter qualification standards. *Id.* § 1973gg(b). Far from authorizing states to impose any type of mental capacity standard they choose, as defendants suggest, Defs.' Br. at 20, the NVRA provision cited by defendants simply recognizes that states may have voting capacity requirements, as well as other qualification standards. It does not affect the scope of states' authority to impose mental capacity requirements. The NVRA certainly does not foreclose all other legislation that may limit how states *determine* who has the mental capacity to vote. Nor does the NVRA imply that a state can implement "mental capacity" standards that would be in violation of the Fourteenth Amendment or the ADA, such as Missouri's standard of determining the mental capacity to vote by reference to an individual's guardianship status. To the contrary, the NVRA provides that its rights and remedies are "*in addition* to all other rights and remedies provided by law . . . ." 42 U.S.C. § 1973gg-6(d)(1) (emphasis added).

The ADA's bar on discriminatory voter capacity requirements is perfectly consistent with the NVRA's recognition that states may have a mental capacity requirement for voters. For example, a mental capacity standard requiring voters to have the specific mental capacity to *vote* (rather than the capacity to meet food, clothing and shelter needs) would be permissible under both the ADA and NVRA. "Indeed, 'when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l., Inc*., 534 U.S. 124, 144 (2001) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Here, that is easily done. Nothing in the NVRA precludes the ADA's application where a state's mental capacity qualifications tend to screen out people with disabilities and are not necessary to the voting process.

12

Simply put, the ADA's prohibition of Missouri's mental capacity voting standards is completely consistent with the NVRA.

## C.    Plaintiffs are Covered by the ADA and Section 504

Defendants wrongly assert that plaintiffs are not covered by the ADA nor Section 504 because plaintiffs are not "qualified." Defendants argue that plaintiffs are not qualified because they do not meet the voter eligibility requirement that is the basis for their exclusion – the criterion of not being adjudged incapacitated. Their argument is clearly circular. Plaintiffs' lawsuit challenges that very criterion as discriminatory under the ADA and Section 504. The protections in the ADA and Section 504 for "qualified" individuals with disabilities do not give defendants carte blanche to determine who is "qualified."[13] To be "qualified," an individual need not meet any and all criteria imposed by defendants. Rather, a "qualified" individual is one who, with or without reasonable modifications to rules, policies, or practices . . . meets the *essential* eligibility requirements for . . . participation in programs or activities provided by a public entity." 42 U.S.C. § 12115(2). Moreover, a public entity must not "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or

---

[13] A covered entity cannot simply designate as Æessential@ any requirement that it chooses to use in its programs and activities. Instead, the courts must look at the true purpose of the requirement to determine whether it is essential. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689-90 (2001). *See also Alexander v. Choate*, 469 U.S. 287, 299-301 & nn. 19, 21 (1985) (noting that who is qualified and what actions constitute discrimination are "two sides of a single coin; the ultimate question is the extent to which a [covered entity] is required to make reasonable modifications in its programs . . . . Antidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit.").

13

activity, unless such criteria can be shown to be *necessary* for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

The requirement that an individual not be adjudged incapacitated is not an essential eligibility requirement for voting. See Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Summ. J. Br.") at 28-30. An adjudication of full incapacity is a determination that a person "lacks capacity to meet essential requirements for food, clothing, shelter, safety or other care." V.A.M.S. § 475.010. It is not a determination that an individual lacks the capacity to vote, and it does not require any inquiry into a person's ability to make choices about candidates or election issues. As defendants admit, Missouri's electoral process is premised on "citizens' ability to make important and purposeful choices on candidates and issues that affect the lives of all Missouri citizens." Defs.' Br. at 24. It is not premised on citizens' ability to make decisions concerning their food, clothing and shelter needs.

Defendants confuse the incapacity to meet food, clothing and shelter needs with global incapacity – or incapacity to do *anything*. Rather than focusing what is actually required for an adjudication of incapacity, defendants make sweeping contentions that individuals who have been adjudged fully incapacitated lack "any ability to function independently" and "do not possess the ability to function generally." Defs.' Br. at 25, 34. The uncontested facts in this case show that plaintiffs and others adjudged fully incapacitated have the ability to function very well in some areas and less well in others. As plaintiffs' expert, Dr. Appelbaum, explained, it has been recognized since the 1960's that competence is a specific rather than a general attribute, and many people with mental impairments can make some decisions but not others. Pls.' Summ. J. Br. at 3.

14

Indeed, Dr. Appelbaum's uncontested assessments show that plaintiff Scaletty and plaintiff MOPAS's representative constituents have the capacity to vote despite having been adjudged fully incapacitated. Pls.' Summ. J. Br. at 24-25. Plaintiffs' expert as well as other knowledgeable witnesses – including Missouri service providers, public administrators, and advocates – observed that many other individuals besides the plaintiffs have the capacity to vote despite being adjudged incapacitated. *Id*. at 27-28.[14] Even defendants' expert acknowledges that it is reasonable for other states to preserve the voting rights of individuals under guardianship, or to take away their voting rights only upon a determination that they lack the competence to vote. *Id*. at 30. Consequently, the absence of an adjudication of incapacity cannot be an essential eligibility requirement for voting.

Thus, plaintiffs' inability to meet the requirement of not being adjudged incapacitated does not impact the viability of their ADA and Section 504 claims. For the reasons described in Pls.' Summ. J. Br. at 20-31, the ADA and Section 504 afford plaintiffs the relief they seek.

> **D.** **Congress Validly Authorized Plaintiffs' Claims Under the ADA and Section 504**
>
>> *1.* *Congress Validly Authorized Plaintiffs' Section 504 Claims Pursuant to its Spending Power*

Defendants' challenge to Congress's power to authorize plaintiffs' claims under Section 504 is unavailing. Defendants challenge only one source of Congressional

---

[14] Defendants have presented no evidence to contest this. Defendants' expert formed no opinion on the voting capacity of the individuals evaluated by Dr. Appelbaum and conceded that some people under full guardianship have the capacity to vote. Pls.' SOUF at ¶¶ 11, 20.

authority to enact Section 504 – Section 5 of the Fourteenth Amendment. Section 504 was enacted pursuant to Congress's Spending power as well as its power under Section 5 of the Fourteenth Amendment. The Eighth Circuit has ruled that Congress validly used its Spending power to authorize suits against states under Section 504. *Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000) (*en banc*), *cert. denied sub nom. Arkansas Dep't of Educ. v. Jim C.*, 533 U.S. 949 (2001). Accordingly, it is irrelevant whether Congress validly authorized claims against states or state officials under Section 5 of the Fourteenth Amendment. Plaintiffs' Section 504 claim is validly authorized under Congress's Spending power.

To the extent that defendants claim that Congress can only regulate voter qualifications using its enforcement powers under the Civil War Amendments, defendants ignore that Congress may use its Spending power to accomplish what it may not do directly under Article I. *See supra* Section II. In *South Dakota v. Dole*, 483 U.S. at 205, the state argued that Congress could not set a minimum drinking age for states accepting federal highway funds, because the Twenty-first Amendment gave states the sole authority to regulate drinking ages. The Court held that even if states did have the sole authority to regulate drinking ages, Congress could validly use its Spending power to condition the receipt of federal funds on states' agreement to adopt the drinking age set by Congress. *Id.* at 205-12. Similarly, Congress can use its Spending power to bar state entities accepting federal funds from imposing discriminatory voter qualifications under Section 504. As the Eighth Circuit has held that Section 504 is a valid exercise of Congress's Spending power, plaintiffs may pursue their Section 504 challenge to defendants' voting ban.

16

2.    *Congress Validly Authorized Plaintiffs' ADA Title II Claims
      Pursuant to its Power under Section 5 of the Fourteenth
      Amendment*

Congress acted well within its authority under Section 5 of the Fourteenth
Amendment in applying Title II of the ADA to voting.[15]   First, the Supreme Court has
held that, at a minimum, Congress validly uses its Fourteenth Amendment authority to
authorize Title II claims for conduct that also violates the Fourteenth Amendment.
*United States v. Georgia*, 126 S.Ct. 877, 881-82 (2006).   For the reasons discussed in
Plaintiffs' Summary Judgment Brief, the conduct giving rise to plaintiffs' ADA claim –
defendants' bar on voting by all individuals adjudged fully incapacitated, regardless of
their capacity to vote – also violates the Fourteenth Amendment's equal protection and
due process clauses.   Pls.' Summ. J. Br. at 31-36.   Thus, Congress acted within its
Section 5 authority in authorizing the ADA claim brought by plaintiffs in this case.

Even if the conduct giving rise to plaintiffs' ADA claim did not violate the
Fourteenth Amendment – which it does, *see infra* – Congress acted within its Fourteenth
Amendment authority in authorizing plaintiffs' ADA claim.   The Supreme Court has
viewed Congress's Fourteenth Amendment power to enact Title II of the ADA (the
ADA's public services provisions) much more broadly than its power to enact Title I of
the ADA (the ADA's employment provisions).   In *Tennessee v. Lane*, the Court upheld
Congress's Fourteenth Amendment authority to authorize Title II suits against states with

---

[15] In enacting the ADA, Congress invoked its power to regulate interstate commerce as well as its
power under Section 5 of the Fourteenth Amendment.   42 U.S.C. § 12101(b)(4).   Defendants
have not challenged Congress's Commerce authority in this lawsuit.   Thus, defendants'
challenge, even if successful, could not preclude plaintiffs' ADA claims.   In any event, Congress
validly authorized plaintiffs' claims under its Fourteenth Amendment authority.

21269481\V-1

respect to the application at issue in *Lane* – access to the courts. 541 U.S. 509 (2004). The Court recognized that unlike Title I, which sought to enforce the guarantee of equal protection in the area of employment, Title II also sought to enforce "a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." *Id*. at 523 (citing *inter alia, Dunn*, 405 U.S. at 336-37 (applying strict scrutiny to a voter qualification standard that interfered with individuals' fundamental right to vote)).

The Supreme Court has given Congress far more latitude to legislate under Section 5 of the Fourteenth Amendment in areas involving fundamental rights, where heightened scrutiny is applied to government action. *See, e.g., Nevada Dep't of Hum. Resources v. Hibbs*, 538 U.S. 721 (2003) (upholding family leave provisions of Family and Medical Leave Act as valid Section 5 legislation and relying heavily on heightened scrutiny standard applied in reviewing history of gender discrimination in leave policies); *Lane*, 541 U.S. at 533-34 (upholding ADA Title II's application to access to courts, where fundamental rights were at stake). This case involves deprivation of the fundamental right to vote, an area in which heightened judicial scrutiny is invoked. *See Dunn*, 405 U.S. at 337; s*ee also* Michael E. Waterstone, *Lane, Fundamental Rights, and Voting*, *supra*, at 833-44 (arguing that *Lane*'s treatment of fundamental rights areas compels the conclusion that Congress validly used its Fourteenth Amendment authority to apply Title II of the ADA to voting).

In order to legislate under Section 5 of the Fourteenth Amendment, Congress must have acted based on a history of constitutional violations supporting the need for prophylactic legislation, and the legislation must be an appropriate response to that

history.  *Lane*, 541 U.S. at 523-33; *see also City of Boerne v. Flores*, 421 U.S. 507, 520 (1997) ("There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.").  Both prongs of this test are met here.

The *Lane* opinion makes clear that Congress acted based on a sufficient history of constitutional violations to support Title II generally, as well as its application to voting. The Court in *Lane* concluded that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systemic deprivations of fundamental rights."  *Id*.  Prominent among the types of unconstitutional conduct that the Court described were examples of deprivations of voting rights of people with disabilities.  *Id.* at 524, 525 & nn. 5, 6, 7, 13.  Indeed, the Court specifically discussed voting bans like Missouri's that bar groups of individuals with mental disabilities from voting without an individualized assessment of their capacity to vote:  "[a]s of 1979, most States . . . categorically disqualified 'idiots' from voting, without regard to individual capacity. . . . The majority of these laws remain on the books . . . and have been the subject of legal challenge as recently as 2001."  *Id*. at 524 (citations omitted).  The Court twice referenced *Doe v. Rowe*, 156 F. Supp.2d 35 (D. Me. 2001), which like the instant case, involved a ban on voting by individuals under guardianship.  *Lane*, 541 U.S. at 525 nn. 7 & 13.

The *Lane* Court also relied on Congress's finding in the ADA that "discrimination against individuals with disabilities persists in such critical areas as . . . education, transportation, communication, recreation, institutionalization, health services, voting,

and access to public services." *Lane*, 541 U.S. at 529 (quoting 42 U.S.C. § 12101(a)(3)).
The Court stated:

> This finding, together with the extensive record of disability discrimination that underlies it, makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation.

*Id.* Thus, the Court concluded that the record of disability discrimination underlying all of Title II of the ADA is a sufficient record for purposes of Congress's authority to legislate under Section 5 of the Fourteenth Amendment.[16] The Court's opinion also demonstrates that Congress acted based on ample evidence of unconstitutional conduct in the specific area of voting.[17]

Further, the application of Title II to the voter qualification requirements in this case is clearly a congruent and proportional response to the history of discrimination in this area. The standard imposed by the ADA is extraordinarily similar to the standard imposed by the Equal Protection Clause of the Fourteenth Amendment. The ADA provides that a public entity may not impose eligibility criteria that tend to screen out people with disabilities from full and equal enjoyment of a service, program, or activity unless those criteria are shown to be necessary for the provision of the service, program

---

[16] *See also Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005) ("After *Lane*, it is settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services. This conclusion is sufficient to satisfy the historical inquiry into the harms sought to be addressed by Title II."); *Association for Disabled Americans, Inc. v. Florida Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005) (same).

[17] For additional examples of state discrimination against people with disabilities supporting Title II's application to voting, *see, e.g.*, Brief Amici Curiae of Paralyzed Veterans of America, Easter Seals and Ten Other Organizations Supporting Petitioners in *United States v. Goodman*, at 21-22, 2005 WL 1812484 (July 29, 2005); Brief of Private Respondents in *Tennessee v. Lane*, at 43-44, 2003 WL 22733904 (Nov. 12, 2003).

21269481\V-1

or activity. 28 C.F.R. § 35.130(b)(8). Similarly, the Equal Protection Clause bars a public entity from denying a class of individuals the right to vote unless the exclusion can be shown to be narrowly tailored to a compelling government interest. *Dunn*, 405 U.S. at 337. Given the close similarity of these standards, the ADA is certainly not "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532. Instead, it is "a reasonable prophylactic measure, reasonably targeted to a legitimate end." *Lane*, 541 U.S. at 533. Thus, Congress validly authorized the ADA claim in this case using its power under Section 5 of the Fourteenth Amendment.

## IV.    The Equal Protection Clause Prohibits Voting Bans Like Missouri's

Defendants' arguments concerning plaintiffs' Equal Protection claim are entirely without merit. Defendants' reliance on cases in which voting restrictions have been upheld is misplaced. Defs.' Br. at 28-29. The fact that some restrictions have survived equal protection challenges in some cases obviously does not mean, as defendants contend, that states have unfettered authority to limit who can vote. To the contrary, the Supreme Court has consistently held that "[o]nce the franchise is granted to the electorate, lines may not be drawn [that] are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper*, 383 U.S. at 665; *see also Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (citing *Harper*).

Defendants wrongly contend that *Oregon v. Mitchell* governs the analysis for plaintiffs' Equal Protection claim. Specifically, they contend that *Mitchell* gives states unfettered discretion to set voter qualifications. As discussed previously, *Mitchell* does not support this proposition. *See supra* at 7. As this Court has already recognized, the

21269481\V-1

appropriate standard for reviewing the equal protection challenge in this case is set forth in *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). *See* Order Denying Pls' Mot. for Prelim. Inj. at 7-8.  Defendants acknowledge that *Burdick* requires severe restrictions on the right to vote to be "narrowly drawn to advance a state interest of compelling importance."  Defs.' Br. at 27.  However, defendants incorrectly apply the less stringent standard that *Burdick* permits only where the state imposes only "reasonable, nondiscriminatory restrictions." Defs.' Br. at 27.

This case does not present the circumstances under which the less stringent *Burdick* standard may be used.  In *Burdick*, the Court analyzed a ban on write-in votes imposed upon all Hawaii voters under the less stringent standard.  *Burdick*, 504 U.S. at 440.  The voting restriction at issue here is significantly more onerous, and therefore, demands the stricter *Burdick* analysis.  First, Missouri's voting restrictions impose a complete bar on voting rather than simply placing a reasonable restriction on the manner in which ballots are cast, as was the case with Hawaii's restrictions.  There is no more severe restriction than a complete bar on voting.  Additionally, Missouri's voting ban singles out a class of individuals to be excluded from voting rather than applying to all of the states' voters like the Hawaii restriction challenged in *Burdick*.  Therefore, under *Burdick*, defendants must show the challenged provisions are narrowly drawn to advance a compelling state interest.  *See also Dunn*, 405 U.S. at 337 (where the state grants the right to vote to some citizens and denies the franchise to others, the exclusions must be narrowly tailored to promote a compelling state interest); Order Denying Pls' Mot. for Prelim. Inj. at 7-8.

21269481\V-1

Defendants' voting ban cannot pass the stricter standard set forth in *Burdick* for the reasons described in Pls.' Summ. J. Br. at 31-36. The Supreme Court has stated that:

> In pursuing [an] important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with "precision," . . . and must be "tailored" to serve their legitimate objectives. . . . And *if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.* If it acts at all, it must choose "less drastic means."

*Dunn*, 405 U.S. at 343 (internal quotations and citations omitted) (emphasis added). Defendants' own expert opined that the less restrictive mental capacity requirements used by many state voting systems – such as requiring an individualized assessment of a person's capacity to vote – are reasonable. Pls.' Summ. J. Br. at 30 & n.21. Thus, there is no dispute that there are alternative ways to accomplish defendants' goals that are reasonable and less restrictive than defendants' blanket prohibition on voting by individuals under guardianship. *Id.* at 29-30. Accordingly, defendants' voting ban cannot withstand strict scrutiny.

Defendants' argument about the need to preserve election integrity holds no weight. Defendants assert that the integrity and appearance of integrity of the electoral process constitute a significant state interest, that voting by individuals adjudged fully incapacitated "cancel[s] the vote of a person who purposely and intelligently casts a vote," and that such votes "would adversely impact the public's perception of the dignity and efficacy of the democratic process." Defs.' Br. at 32, 33. Defendants choose to ignore that disenfranchising qualified voters undermines the integrity of the electoral system, both in reality and in perception. No case defendants cite sanctions achieving "integrity" by disenfranchising qualified voters. When persons are disenfranchised in the

name of integrity, the integrity depends on the correctness of the action. Defendants' actions are incorrect for several reasons.

Defendants weave a scenario without evidence: they assert that voting by persons adjudged fully incapacitated "could lead to double voting because these individuals would be particularly susceptible to influence by their guardians or any others with whom they have contact and it is these other individuals who realistically could be voting their own and the ward's ballot." Defs.' Br. at 33. The argument propounds the exact stereotype civil rights laws like the ADA and Section 504 were designed to address. Defendants' concerns are based on wrongdoing by others – specifically on persons the state through its guardianship appointment has chosen to protect their wards. Any guardian, of course, can misbehave. But to deny an individual the right to vote because of the possibility of wrongdoing by someone *the state has approved to act in a fiduciary capacity* turns the law on its head. Persons who are visually impaired or who cannot read similarly need the assistance of someone to mark their ballots and are equally susceptible to being "helped" by disreputable persons, yet Missouri does not prohibit these individuals from voting on this basis. Defendants' argument spins out a theory, unsupported by any evidence, that singles out persons with some mental incapacity and is based on stereotypical prejudice. The assertion undercuts their entire defense. *Cf. City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) (exemptions from an otherwise legitimate regulation of a type of speech may "diminish the credibility of the government's rationale for restricting speech in the first place.").

Moreover, defendants press the untrue proposition that an adjudication of "full mental incapacity demonstrate[s] that the persons so adjudged do not possess the ability

to function generally." Defs.' Br. at 34. All of the evidence in the record, however, belies this view. The record contains evidence regarding numerous people from across the state who have been adjudged incapacitated and placed under full guardianship yet are far from lacking the ability to function generally. These individuals not only have the capacity to vote, but keep up with current events, participate in the political process by lobbying their legislators, actively contribute to community organizations, and work. Pls.' SOUF at ¶¶ 29-31; 39-42; 52-55; 66-67; 76. Defendants cannot justify denying persons with the capacity to vote the right to do so because of purported public concerns when they are demonstrably inaccurate and perpetuated by defendants' broad mischaracterizations of persons under guardianship despite the record in this case. There is no compelling governmental interest in preserving stereotypes and prejudice.

Defendant's concerns about the ramifications of a decision in favor of plaintiffs are misplaced. Defendants note that "the logical implication of plaintiffs' argument would require an individualized determination by federal and state courts of an individual's capacity to serve as a juror . . . despite a previous adjudication of incapacity." Defs.' Br. at 32. Defendants characterize such implications as "breathtaking." *Id*. at 31.[18] Defendants' example, however, supports *plaintiffs'* argument, as this doomsday scenario is exactly what the law already requires. Neither the federal nor state statutes cited by defendants impose a blanket prohibition on persons

---

[18] Defendants also note that individuals under guardianship in Missouri lose driving privileges and contractual rights, but ignore that the removal of these non-fundamental rights is not subject to the type of strict scrutiny that voting is. To the extent that defendants may take away other fundamental rights due to guardianship status, they must demonstrate that the removal is narrowly tailored to a compelling government interest.

Case 2:04-cv-04248-ODS   Document 142   Filed 04/25/06   Page 31 of 39

under guardianship serving as jurors. In fact, both federal and state laws require an *individualized assessment* be made to determine whether an individual has the specific capacity to serve *as a juror* before disqualifying the individual. See 28 U.S.C. § 1865(b)(4) (individuals "incapable by reason of mental . . . infirmity, *to render satisfactory jury service*" are not qualified to serve as federal jurors) (emphasis added); V.A.M.S. § 494.425 (individuals "incapable of performing *the duties of a juror* because of a mental . . . illness or infirmity" are disqualified from jury service in state court) (emphasis added).[19] This inquiry into the specific type of capacity at issue is precisely what plaintiffs contend is required with respect to the right to vote.[20]

In sum, there is no evidence showing Missouri's blanket disenfranchisement of persons under guardianship is necessary to maintain the integrity of the state's elections. The categorical exclusion of these individuals from voting is over-inclusive because it captures persons who have the capacity to vote.[21] Other reasonable and less-restrictive means of insuring that persons without the capacity to vote are not allowed to vote are

---

[19] The Missouri juror qualification form asks: "Do you have a physical or mental disability that would interfere with or prevent you from serving as a juror? If yes, doctor's letter must be provided." Available at http://www.courts.mo.gov/sup/index.nsf/OrdersRules?OpenView.

[20] Obviously plaintiffs have no intention of eliminating age requirements for voting, as defendants suggest. Defs.' Br. at 35. Plaintiffs seek relief only for individuals under guardianship, and only for discrimination based on mental disability, not age. Defendants' suggestion that plaintiffs intend to eliminate all mental capacity requirements is similarly baseless. Plaintiffs merely seek to ensure that the capacity requirement is tied to an individual's capacity *to vote*. Finally, defendants' argument that their use of the guardianship standard avoids the morass of inquiring into individuals' political beliefs begs the question of whether this is the most narrowly tailored standard. *Id.* at 35-36. There are other standards that also avoid this morass that are far more narrowly tailored than the guardianship standard – for example, the standard of whether individuals understand the nature and effect of voting. That inquiry is far more tailored than inquiring into individuals' ability to meet their nutritional and housing needs.

[21] It is also underinclusive. *See* Pls.' Summ. J. Br. at 33.

21269481\V-1

available.  *See infra* and Pls.' Summ. J. Br. at 29-30, 35.  Accordingly, the state's scheme cannot survive strict scrutiny.

**V.      Missouri's Voting Ban Also Violates the Due Process Clause**

Defendants' complaint that plaintiffs do not raise a true due process claim is baseless.  Defs.' Br. at 34-35.  The due process claim that plaintiffs pursue is one of substantive rather than procedural due process.  Pls.' Summ. J. Br. at 36.  Defendants correctly note that plaintiffs take issue with the *substance* of defendants' voter qualification standard excluding all individuals under full guardianship.  As long as defendants maintain this automatic disqualification of individuals under full guardianship, no process would adequately preserve individuals' right to vote.

**VI.     Missouri Law Prohibits Voting By Individuals Under Full Guardianship**

Defendants' assertion that individuals who have the capacity to vote will not lose their right to vote in guardianship proceedings is simply untrue.  Defendants claim that if a prospective ward has the capacity to vote, the petitioner in the guardianship proceedings will not be able to meet his or her burden of proving incapacity.  Defs.' Br. at 38.  This contention ignores the undisputed fact that the standard for proving incapacity is the inability to meet food, clothing, shelter and safety needs, V.A.M.S. § 475.010(9), not the capacity to vote.  A petitioner in guardianship proceedings is not required to prove that the prospective ward lacks the capacity to vote.  In fact, voting was never raised in the guardianship hearings of MOPAS's representative constituents and many others.  Pls. SOUF at ¶¶ 47, 100, 101.  The record contains undisputed evidence that numerous individuals were found by a probate court to meet the standard for incapacity yet have the capacity to vote.  *Id.* at ¶¶ 11, 19, 33-36,44-46; 57-59; 69-72; 77-80; 83; 88.

21269481\V-1

Defendants also claim that if an individual who is already under full guardianship has the capacity to vote, he or she may seek to have the guardianship order modified to reserve the right to vote. Defs.' Br. at 38. As defendants explain, however, they simply mean that individuals may seek to have their guardianship converted to a limited guardianship by demonstrating that they have partial capacity to meet food, clothing and shelter needs, and not by demonstrating the capacity to vote. *Id.* at 40. But as the record makes clear, there are numerous individuals who meet the standards for full incapacity yet have the capacity to vote. For these individuals, modifying their guardianships to limited guardianships in order to gain the right to vote simply is not an option.

Defendants also suggest that individuals may somehow retain the right to vote by proving their capacity to vote in guardianship proceedings, despite defendants' insistence that voting capacity cannot be determined. Defendants cannot have it both ways. Missouri law plainly removes the right to vote from anyone who is adjudged as lacking capacity to meet food, clothing, shelter and safety needs. V.A.M.S. § 115.133; Mo. Const. Art 8, § 2. Defendants' asserted justification for this law is it is impossible to determine an individual's competence to vote, and guardianship status is an appropriate proxy for voting competence. Defendants maintain that the standard for full guardianship "must serve as the closest approximation that is legally practicable" to assess the competence to vote. Defs.' Br. at 39. If defendants do not interpret their own law to

require a determination that a person lacks the competence to vote before the person loses the right to vote, they cannot ask this Court to adopt that interpretation.[22]

Finally, defendants contend that if plaintiffs are unsatisfied with the probate courts' failure to determine their competence to vote, their remedy is to appeal the probate courts' guardianship orders. Defs.' Br. at 41. This argument ignores the fact that probate courts are charged with determining whether prospective wards have the capacity to meet food, clothing and shelter needs, and not whether they have the capacity to vote. V.A.M.S. § 475.010(9). It is Missouri's law, not the probate courts, that removes the right to vote from people who lack the capacity to meet food, clothing and shelter needs. A probate court would correctly impose a full guardianship if it determined that an individual lacked the capacity to meet food, clothing and shelter needs, regardless of the person's capacity to vote. An appeal of that determination would not succeed if the appellant did not challenge the determination itself but rather the collateral consequence of that determination – that Missouri law provides that the individual loses the right to vote. The case of plaintiff Scaletty demonstrates this with particular clarity: the probate court actually reserved Mr. Scaletty's right to vote in his guardianship order despite Missouri law, but he was still denied the right to vote based on Missouri law. Mr. Scaletty's problem could hardly be solved through an appeal challenging the probate court's decision, as there was nothing for him to appeal.

---

[22] Moreover, defendants' reliance on plaintiff Scaletty's guardianship order is misplaced. Mr. Scaletty's situation demonstrates that the law *still* operated to deny him the right to vote based on guardianship status despite the reservation of his right to vote in his guardianship order. *See supra.*

21269481\V-1

## **CONCLUSION**

For these reasons, this Court should deny defendants' Motion for Summary Judgment.

21269481\V-1

Respectfully submitted,


/s/ James M. Kirkland
James M. Kirkland #50794
SONNENSCHEIN NATH & ROSENTHAL LLP
4520 Main Street, Suite 1100
Kansas City, MO 64111
(816) 460-2400
(816) 531-7545 (facsimile)


Jeff M. Plesko
John Wank
GUARDIANSHIP AND ADVOCACY
COMMISSION
4500 College Avenue, #100
Alton, IL 62002
(618) 474-5503
(618) 474-5517 (facsimile)


Ira A. Burnim
Jennifer Mathis
Alison N. Barkoff
BAZELON CENTER FOR MENTAL HEALTH
LAW
1101 15th Street, NW, Suite 1212
Washington, D.C. 20005
(202) 467-5730
(202) 223-0409 (facsimile)


Neil Bradley
ACLU NATIONAL VOTING RIGHTS PROJECT
2725 Harris Tower
233 Peachtree Street NE
Atlanta, GA 30303
(404) 523-2721
(404) 653-0331 (facsimile)

31

Anthony E. Rothert, #44827
James G. Felakos, #56356
AMERICAN CIVIL LIBERTIES UNION OF
EASTERN MISSOURI
4557 Laclede Ave.
St. Louis, MO 63108
(314) 361-2111
(314) 361-3135 (facsimile)


Michael H. Finkelstein, #25468
David E. Hale, #54641
MISSOURI PROTECTION AND ADVOCACY
SERVICES
925 South Country Club Drive
Jefferson City, MO 65109
(573) 893-3333
(573) 893-4231 (facsimile)


ATTORNEYS FOR PLAINTIFFS

21269481\V-1

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of April, 2006, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which sent notification

of such filing to the following:

      Michael Pritchett
      Missouri Attorney General's Office
      Broadway State Office Building
      P.O. Box 899
      Jefferson City, MO 65102

                                /s/ James M. Kirkland
                                Attorneys for Plaintiffs

21269481\V-1